IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

REBECCA SNOEYENBOS,
        Plaintiff,

v.                                                          Civil No. 3:19cv377 (DJN)

MARCIA CURTIS, *Deputy Sheriff of
Spotsylvania County, in Her Personal
Capacity*,
        Defendant.

## MEMORANDUM OPINION

Plaintiff Rebecca Snoeyenbos ("Plaintiff") brings this action pursuant to 42 U.S.C.

§ 1983 against Spotsylvania County Deputy Sheriff Marcia Curtis ("Defendant"), alleging that

Defendant violated her First Amendment rights by offering to buy lunch for a fellow deputy if he

issued a citation to Plaintiff for reckless driving in retaliation for Plaintiff complaining to the

Spotsylvania County Sheriff and her social media followers about Defendant. This matter comes

before the Court on Defendant's Motion for Summary Judgment (ECF No. 43), moving the

Court to grant summary judgment to Defendant on the issue of qualified immunity. For the

reasons set forth below, the Court GRANTS IN PART and DENIES IN PART Defendant's

Motion for Summary Judgment (ECF No. 43). The Court GRANTS Defendant's Motion to the

extent that Plaintiff alleges Defendant's liability on a theory that Defendant threatened, coerced

or intimidated her in retaliation for her First Amendment activity or on a theory that the traffic

citation issued to her had a chilling effect on her speech, and the Court DENIES Defendant's

Motion to the extent that Plaintiff alleges Defendant's liability on a theory that Defendant's

inducement of another officer to issue the traffic citation violated her rights.

# I.    BACKGROUND

For the purposes of background only, the Court recites the basic allegations in Plaintiff's Complaint.

## A.    Plaintiff's Allegations

On May 20, 2019, Plaintiff filed her Complaint against Defendant, seeking relief pursuant to 42 U.S.C. § 1983. (Compl. (ECF No. 1).) Plaintiff's Complaint alleges that Defendant offered to buy lunch for a fellow deputy sheriff, Deputy Riley, if he issued a traffic citation to Plaintiff incident to a stop of Plaintiff's vehicle for passing a school bus that was in the process of loading students. (Compl. ¶¶ 4-7.) Plaintiff alleges that Defendant's offer to buy Deputy Riley lunch if he issued Plaintiff a citation constituted a bribe in retaliation for Plaintiff exercising her First Amendment rights by: (1) complaining about Defendant to the Spotsylvania County Sheriff and on Facebook after Defendant issued a parking ticket to Plaintiff in 2013; (2) testifying in her defense after Defendant issued the 2013 parking ticket; and, (3) giving "dirty looks" to Defendant. (Compl. ¶¶ 7, 11, 15-17.)

## B.    Defendant's Motion for Summary Judgment

Because Supreme Court jurisprudence dictates that qualified immunity "is effectively lost if a case is erroneously permitted to go to trial," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), on December 18, 2019, the Court ordered briefing on whether qualified immunity shields Defendant from liability in this case, (Order (ECF No. 41)). Pursuant to the Court's Order, on January 10, 2020, Defendant filed her Motion for Summary Judgment (ECF No. 43), moving the Court to grant summary judgment in her favor on the issue of qualified immunity.

In support of her Motion, Defendant argues that qualified immunity precludes liability in this case, because on the date of her alleged conduct, "no government official in her position

2

would have known that what she said to Deputy Riley during the traffic stop would chill [Plaintiff's] First Amendment rights." (Br. in Supp. of Mot. for Summ. J. ("Def.'s Mem.") (ECF No. 44) at 6.) Defendant contends that no controlling authority or robust consensus of persuasive authority exists that proscribes Defendant's specific conduct. (Def.'s Mem. at 6-8.) And Defendant warns the Court against defining her conduct too broadly. (Def.'s Mem. at 8-9.) Considering the specific conduct alleged — offering to buy lunch for another officer if he issued a citation incident to a stop that the other officer initiated independently — Defendant maintains that qualified immunity applies in this case. (Def.'s Mem. at 9-10.)

On January 20, 2020, Plaintiff filed her Response to Defendant's Motion, (Pl.'s Resp. in Opp. to Def.'s Mot. for Summ. J. ("Pl.'s Resp.") (ECF No. 45)), and, on January 31, 2020, Defendant filed her Reply, (Reply Br. in Supp. of Mot. for Summ. J. ("Def.'s Reply") (ECF No. 46)), rendering the matter now ripe for review.

## II.     STANDARD OF REVIEW

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry in a summary judgment analysis focuses on "whether the evidence presents a sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). In reviewing a motion for summary judgment, the Court must view the facts in the light most favorable to the non-moving party. *Id.* at 255. Moreover, the Court cannot weigh the evidence to enter a judgment, but simply must determine whether a genuine issue for trial exists. *Greater Balt. Ctr. for Pregnancy Concerns v. Mayor of Baltimore*, 721 F.3d 264, 283 (4th Cir. 2013).

3

Once the moving party properly submits and supports a motion for summary judgment, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; instead, there must be no genuine issue of material fact. *Anderson*, 477 U.S. at 247-48. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

In the context of qualified immunity, the Supreme Court has established a two-step inquiry in which courts must determine: (1) "whether the facts that a plaintiff has alleged [if resolved on a motion to dismiss] or shown [if resolved on a motion for summary judgment] make out a violation of a constitutional right;" and, (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Although the Supreme Court previously mandated that courts follow these steps in sequential order, in *Pearson*, the Court held that "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory." *Id.* at 236. Thus, "judges of the district courts . . . [may] exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." *Id.* For example, courts may start with the second prong in cases "in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." *Id.* at 237.

## III.   ANALYSIS

Although Plaintiff's Complaint provides no clear demarcation of the theories under which she seeks to hold Defendant liable, in her response to Defendant's Motion for Summary

Judgment, Plaintiff provides three theories for how Defendant allegedly violated her constitutional rights. First, Plaintiff argues that Defendant's undisputed conduct constituted a retaliatory "'threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action will imminently follow.'" (Pl.'s Resp. at 20 (quoting *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 687 (4th Cir. 2000)).) Second, Plaintiff argues that Defendant's conduct falls within clearly established precedent proscribing the retaliatory arrest — or, in this case, citation — of a person when there exists no probable cause for the arrest or citation. (Pl.'s Resp. at 23-24.) And, third, Plaintiff contends that Defendant's offer to buy Deputy Riley lunch had a chilling effect in its own right regardless of any probable cause that justified Deputy Riley's citation. (Pl.'s Resp. at 24.) The Court will consider each of these theories in turn.

### A.     The Undisputed Facts

For the purposes of determining whether Defendant violated Plaintiff's clearly established rights, the Court accepts the following facts as undisputed. In 2013, while Defendant served on assignment at Livingston Elementary School, Defendant issued a parking ticket to Plaintiff for parking in a fire lane. (Ex. 2 to Def.'s Mem. ("Def. Aff.") (ECF No. 44-2) ¶¶ 2-3.) In response to the parking ticket, Plaintiff called the Spotsylvania County Sheriff's Office to complain about Defendant and voiced her negative opinion about Defendant to staff at the elementary school. (Def. Aff. ¶ 5.)

Six years later, on January 24, 2019, at approximately 8:06 a.m., Deputy Riley observed three vehicles pass a stopped school bus with flashing lights and extended "STOP" signs that was in the process of loading children. (Ex. 1 to Def.'s Mem. ("Riley Aff.") (ECF No. 44-1) ¶¶ 5-9.) Deputy Riley activated the lights on his police cruiser and followed the three vehicles to the intersection of Jefferson Davis Highway and Market Street in Spotsylvania County. (Riley

Aff. ¶ 8.) At the intersection, Deputy Riley exited his cruiser and directed the drivers of the three vehicles to pull into a nearby parking lot. (Riley Aff. ¶ 8.) The drivers complied with Deputy Riley's instructions. (Riley Aff. ¶ 8.) Plaintiff operated the third vehicle. (Riley Aff. ¶¶ 9, 11.)

After all three drivers pulled into the parking lot, Deputy Riley called in to dispatch with the respective license plate numbers on the vehicles, providing Plaintiff's license plate information last. (Riley Aff. ¶ 9.) Deputy Riley then asked all three drivers to produce their driver's licenses and registration information. (Riley Aff. ¶ 12.) When handing over her information, Plaintiff apologized for passing the school bus and explained that she had "tunnel vision" while driving, adding that she knew "exactly where" the school bus that she had passed was located. (Ex. 9 to Def.'s Mem. in Supp. of Partial Mot. for Summ. J. ("Video") (ECF No. 23-9) at 00:29-44.) Deputy Riley explained what he saw, and Plaintiff confirmed that she understood what she had done to warrant the traffic stop. (Video at 00:55-01:04.) As Deputy Riley began to write the first ticket, he received a call from Defendant on his cell phone and answered the call using the Bluetooth feature in his cruiser. (Riley Aff. ¶ 14; Video at 01:38.)

During the phone call, Defendant asked if Deputy Riley's phone was "secure." (Video at 01:40-44.) After Deputy Riley confirmed that his phone was "secure," Defendant stated that if Deputy Riley issued a citation to "this Snoeyenbos person, [she would] buy [him] lunch," to which Deputy Riley responded "Okay." (Video at 01:44-54.) Defendant inquired why Deputy Riley had pulled the "Snoeyenbos person" over, and after Deputy Riley explained the reason for the stop, Defendant stated: "Well I think you are going to ticket them anyway. Is this a male or female?" (Video at 01:54-02:05.) Deputy Riley confirmed Plaintiff's identity, to which Defendant responded: "Oh my god, she is such a bitch. Make sure you have your recorder on." (Video at 02:05-12.) Defendant explained that she had previously ticketed Plaintiff for parking

in a fire lane and that Plaintiff had "raised holy hell . . . call[ing] the Sheriff . . . put[ting] nasty

stuff on Facebook about [her] . . . [and] giv[ing] her dirty . . . looks." (Video at 02:12-35.)

Defendant then repeated that if Deputy Riley issued a citation to Plaintiff, she would "buy [him]

lunch." (Video at 02:35-41.) Deputy Riley responded "Okay," and Defendant stated that she

would buy Deputy Riley lunch "another day." (Video at 02:41-45.) Deputy Riley responded:

"All right. Sounds good." (Video at 02:47.) After Defendant again admonished Deputy Riley

to record his interactions with Plaintiff, the call ended. (Video at 02:47-57.)

Following his phone call with Defendant, Deputy Riley completed the citation for

reckless driving that he issued to Plaintiff. (Riley Aff. ¶ 17; Video at 02:57-10:40.) After

issuing the citation to Plaintiff, Deputy Riley returned to his cruiser and began completing the

citation for the next driver. (Video at 10:55-11:35.) While completing the second citation,

Deputy Riley received a priority call of an assault in progress at an Econo Lodge located

approximately 1,000 yards from the parking lot where the drivers had pulled over. (Riley Aff.

¶ 21; Video at 11:35-45.) Deputy Riley issued a verbal warning to the drivers of the remaining

two vehicles and pulled away to respond to the priority call. (Riley Aff. ¶¶ 20-24; Video at

11:55-12:28.) As Deputy Riley approached his cruiser to respond to the priority call, Plaintiff

returned in her vehicle to ask why the other two drivers did not receive a citation, and Deputy

Riley explained that he had received a priority call but would follow up with the other two

drivers. (Video at 12:31-56.)

### B. The Undisputed Facts Do Not Support a Threat, Coercion or Intimidation Theory of Liability Against Defendant.

As mentioned, Plaintiff first contends that on January 24, 2019, Defendant would have

known that her conduct violated Plaintiff's First Amendment rights, because her conduct

constituted "'a threat, coercion, or intimidation intimating that punishment, sanction, or adverse

regulatory action will imminently follow.'" (Pl.'s Resp. at 20 (quoting *Suarez Corp.*, 202 F.3d at 687).) Indeed, in *Suarez Corporation Industries v. McGraw*, the Fourth Circuit held that when a public official's allegedly retaliatory conduct "[is] in the nature of speech, in the absence of a threat, coercion, or intimidation intimating that punishment, sanction, or adverse retaliatory action will imminently follow, such speech does not adversely affect a citizen's First Amendment rights, even if defamatory." 202 F.3d at 687. However, the undisputed facts do not show that Defendant's conduct fits within the sort of "threat, coercion, or intimidation" described in *Suarez Corporation* and its progeny.

Indeed, in recognizing the "threat, coercion, or intimidation" theory of First Amendment retaliation, the Fourth Circuit in *Suarez Corporation* cited to cases holding that retaliation by speech requires some actual or threatened imposition of *governmental* power toward an individual. 202 F.3d at 687-88 (citing in part *Penthouse Int'l Ltd. v. Meese*, 939 F.2d 1011, 1015-16 (D.C. Cir. 1991) (holding that public officials were entitled to qualified immunity for criticism leveled at publishers of pornography, noting that "the Supreme Court has never found a government abridgement of First Amendment rights in the absence of some actual or threatened imposition of governmental power or sanction"); *R.C. Maxwell Co. v. Borough of New Hope*, 735 F.2d 85, 89 (3d Cir. 1984) (holding that borough did not violate billboard owner's First Amendment rights by encouraging, but not threatening or coercing, a landlord to terminate its leases with the owner); and *Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33, 38-39 (2d Cir. 1983) (holding that public official did not violate game manufacturer's First Amendment rights when the official sent letters requesting that retail stores refrain from selling the manufacturer's game and declaring that to infringe on another's First Amendment rights, the official's comments must "reasonably be interpreted as intimating that some form of punishment or adverse

8

regulatory action will follow the failure to accede to the official's request")). And in cases following the *Suarez Corporation* holding, the Fourth Circuit has likewise limited the types of conduct giving rise to a First Amendment retaliation claim to instances in which the government official threatened to commit or actually committed official action against the protected speaker. *See, e.g.*, *Trulock v. Freeh*, 275 F.3d 391, 405 (4th Cir. 2001) (holding that the plaintiff stated a plausible First Amendment retaliation claim based on allegations that the defendants instigated searches of the plaintiff's property in retaliation for comments made by the plaintiff in an article); *Blankenship v. Manchin*, 471 F.3d 523, 530 (4th Cir. 2006) (holding that the leader of an energy company stated a plausible First Amendment retaliation claim based on West Virginia governor's remarks in a newspaper that the energy company could expect more regulatory oversight following the leader's opposition to the governor's pension bond reforms, because the remarks constituted "a threat . . . directed towards an individual who is the head of a company in a highly regulated industry").

Here, on the other hand, the undisputed facts show that Defendant contacted Deputy Riley in a private phone call after Deputy Riley independently initiated the stop of Plaintiff's vehicle and offered something of value — namely, lunch — in return for Deputy Riley issuing the citation to Plaintiff. Defendant did not threaten governmental action against Plaintiff directly or even Deputy Riley. Neither did Defendant serve in a supervisory capacity such that her words could be interpreted as coercing Deputy Riley. Instead, Defendant, at most, induced a third party to take official action, which does not fall within the *Suarez Corporation* framework. And to the extent that Defendant's conduct fits within the *Suarez Corporation* framework, such a theory proves too novel to put Defendant on fair notice that she was violating Plaintiff's rights, permitting Defendant to rely on qualified immunity.

9

**C.   Plaintiff's Theory that the Traffic Citation Constitutes the Injurious Conduct Requires Her to Establish the Absence of Probable Cause for the Citation, Which the Undisputed Facts Do Not.**

Plaintiff also argues that Defendant's conduct violated her clearly established rights, because the state of the law in January 2019 provided that "a public official is liable when she engages another law enforcement official to institute charges against a person, motivated by the citizen's protected First Amendment activity, when the defendant lacks probable cause for the institution of the criminal charges." (Pl.'s Resp. at 23-24.) In support of this theory of liability, Plaintiff cites to the Fourth Circuit's opinion in *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013), and the Supreme Court's opinion in *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945 (2018). (Pl.'s Resp. at 23.)

In *Tobey*, the Fourth Circuit considered claims brought by the plaintiff, Aaron Tobey ("Tobey"), against agents employed by the Transportation Security Administration ("TSA") and officers at Richmond International Airport. 706 F.3d at 383-84. On December 30, 2010, Tobey proceeded through the TSA checkpoint at Richmond International Airport. *Id.* at 383. After presenting his boarding pass and identification to the pre-screening agent, Tobey continued to the conveyer belt area and placed his belt, shoes, sweatshirt and other carry-on items on the conveyor. *Id.* One of the TSA agents then diverted Tobey from the standard metal detector to an enhanced Advanced Imaging Technology ("AIT") screener. *Id.* at 384. Anticipating that he would be subjected to AIT screening, Tobey had written the text of the Fourth Amendment on his chest, as he believed AIT screening violated his constitutional rights. *Id.* Before entering the AIT screener, Tobey removed his shirt to reveal the text, at which point the TSA agent told him that he did not need to remove his clothing. *Id.* Tobey insisted that he wished to express his views on the constitutionality of the AIT screening. *Id.*

10

After Tobey insisted on remaining shirtless, the TSA agent radioed for assistance while

ordering Tobey to remain in front of the AIT screener. *Id.* The agent's supervisor and another

agent then asked airport police for assistance. *Id.* At no point did Tobey refuse to undergo the

AIT procedures or disobey the agents' orders. *Id.* Nonetheless, after arriving on scene, airport

officers immediately arrested Tobey for creating a public disturbance without knowing what had

transpired. *Id.* Tobey subsequently sued the agents and airport officers pursuant to § 1983 and

*Bivens.* *Id.* The district court dismissed Tobey's claims based on the Fourth and Fourteenth

Amendments but found that qualified immunity did not shield the defendants from Tobey's First

Amendment retaliation claim. *Id.* at 385. The defendants appealed. *Id.*

On appeal, the Fourth Circuit affirmed that Tobey stated a plausible First Amendment

retaliation claim, because: "(1) he engaged in constitutionally protected non-violent protest; (2)

he was seized as a result of the protest; and (3) the temporal proximity of his peaceful protest and

his arrest, unsupported by probable cause, shows Appellants engaged in impermissible

retaliation." *Id.* at 387. The Fourth Circuit further held that qualified immunity did not shield

the agents from liability for Tobey's First Amendment claim, because "it is unreasonable to

effect an arrest without probable cause for displaying a silent, nondisruptive message of protest

— which is what allegedly occurred here." *Id.* at 392 (emphasis removed). And the Fourth

Circuit clarified that its holding aligned with the Supreme Court's decision in *Reichle v.*

*Howards*, 566 U.S. 658 (2012), which held that "a plaintiff could [not] make out a cognizable

First Amendment claim for an arrest that was supported by probable cause," because Tobey's

allegations supported the plausible inference that the airport officers lacked probable cause to

arrest him. *Id.*

Five years later, in *Lozman v. City of Riviera Beach*, the Supreme Court considered First Amendment retaliation claims brought by the plaintiff, Fane Lozman ("Lozman"), against the City of Riviera Beach, Florida (the "City"). 138 S. Ct. at 1949. In 2006, Lozman towed his floating home to a slip in the City-owned marina. *Id.* Soon after his arrival, Lozman started criticizing the City's plan to use its eminent domain power to seize homes along the waterfront for private development. *Id.* Lozman often spoke during the public-comment period at city council meetings, criticizing the City's elected officials and employees. *Id.* Lozman also filed a lawsuit against the City's leaders, alleging that the City Council's approval of an agreement with developers violated Florida's open-meetings laws. *Id.*

In June 2006, in response to Lozman's lawsuit, the City Council held a closed-door session during which one councilmember allegedly suggested that the City use its resources to intimidate Lozman and others who filed lawsuits against the City, and the other councilmembers confirmed their agreement. *Id.* Five months later, the City Council held a public meeting that included a public-comment period. *Id.* Lozman stepped up to the podium to speak about the recent arrest of a former county official, at which point a councilmember directed Lozman to stop commenting on issues unrelated to the City. *Id.* Lozman continued speaking, this time about the arrest of a former official from West Palm Beach, Florida. *Id.* The councilmember then called for police assistance, and an officer approached Lozman and asked him to leave the podium. *Id.* Lozman refused, so the councilmember instructed the officer to carry Lozman out of the meeting room. *Id.* The officer handcuffed Lozman and escorted him to police headquarters, charging him with disorderly conduct. *Id.* at 1950. The state's attorney later determined that the officer had probable cause to arrest Lozman but decided to dismiss the charges. *Id.*

12

During the trial of Lozman's claims, the district court instructed the jury that for Lozman to prevail on his claim for retaliatory arrest, he had to prove that the arresting officer himself possessed impermissible animus against Lozman's protected speech and that the officer lacked probable cause to make the arrest. *Id.* Based on this instruction, the jury found that the officer had probable cause to arrest Lozman for creating a public disturbance. *Id.* The Court of Appeals affirmed the verdict in favor of the City, holding that the existence of probable cause for Lozman's arrest defeated his First Amendment retaliation claim. *Id.* The Supreme Court granted certiorari on the narrow issue of whether the existence of probable cause defeats a claim for retaliatory arrest under § 1983. *Id.* at 1951.

In deciding this narrow issue, the Supreme Court compared its decisions in *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274 (1977), and *Hartman v. Moore*, 547 U.S. 250 (2006). *Id.* at 1952. In *Mt. Healthy*, "the Court held that even if retaliation might have been a substantial motive for the [Board of Education's decision not to rehire an untenured teacher] . . . there was no liability unless the alleged constitutional violation was a but-for cause of the employment termination." *Id.* (citing 429 U.S. at 285-87). By comparison, in *Hartman*, the plaintiff alleged that five postal inspectors instigated a retaliatory prosecution against him for violating federal statutes in the course of lobbying against a particular postal service policy. *Id.* (citing 547 U.S. at 252-53). The Court in *Hartman* held that a plaintiff alleging retaliatory prosecution must show the absence of probable cause for the underlying criminal charge. *Id.* (citing 547 U.S. at 265-66). Only if "the plaintiff proves the absence of probable cause" will courts then proceed to apply the *Mt. Healthy* test. *Id.* (citing 547 U.S. at 265-66). The *Hartman* Court adopted the threshold probable cause inquiry, "because proving the link between the

13

defendant's retaliatory animus and the plaintiff's injury in retaliatory prosecution cases 'is usually more complex than other retaliation cases.'" *Id.* at 1953 (quoting 547 U.S. at 261).

Ultimately, the Supreme Court in *Lozman* avoided answering whether the probable cause inquiry should apply in retaliatory arrest cases, finding Lozman's First Amendment claim "far afield from the typical retaliatory arrest claim." *Id.* at 1954. Specifically, the Court noted that Lozman alleged an "official municipal policy" of intimidation quite apart from the arrest. *Id.* The arrest therefore represented only part of the City's retaliatory conduct. *Id.* Moreover, the Court observed that the causation problem in *Hartman* does not arise in cases such as Lozman's "where . . . the [alleged] retaliation [is] for prior, protected speech bearing little relation to the criminal offense for which the arrest is made." *Id.* Accordingly, the Court held that on facts such as those presented by Lozman, "*Mt Healthy* provides the correct standard for assessing a retaliatory arrest claim," reserving for another time the proper standard for retaliatory arrest claims in other contexts. *Id.* at 1955.

Plaintiff contends that her claims fit within the framework espoused in *Tobey* and *Lozman*, because *Tobey* provided fair notice to Defendant that she could not induce or initiate criminal charges against Plaintiff in retaliation for her protected speech and *Lozman* establishes that Deputy Riley's probable cause to issue the traffic citation to Plaintiff proves inconsequential. (Pl.'s Resp. at 23.) Plaintiff argues that the Supreme Court's post-*Lozman* opinion in *Nieves v. Bartlett*, 139 S. Ct. 1715 (2019), which held that the threshold probable cause inquiry should apply in standard retaliatory arrest cases, should not alter the Court's analysis, because Defendant herself possessed no probable cause to issue the traffic citation to Plaintiff. (Pl.'s Resp. at 23-24.) Plaintiff maintains that the holding in *Tobey* provided fair notice that Defendant could not cause the issuance of a citation in retaliation for Plaintiff's exercise of her First

Amendment rights. (Pl.'s Resp. at 24.) The Court finds Plaintiff's argument inapposite to the extent that she alleges a chilling effect from Deputy Riley's traffic citation.

Indeed, Plaintiff's inducement theory based on the chilling effect of the traffic citation requires the Court to consider whether Deputy Riley had probable cause to issue the citation to Plaintiff, because such a theory presents the causal connection problem highlighted by the Supreme Court in *Nieves* and that did not exist in *Lozman. Nieves* involved a § 1983 claim brought by the plaintiff-respondent Russell Bartlett ("Bartlett") against two police officers, alleging that the officers retaliated against him for his protected speech by arresting him for disorderly conduct and resisting arrest. 139 S. Ct. at 1720. Bartlett attended the 2014 Arctic Man festivities in Paxson, Alaska, where the two officers were on patrol. *Id.* When one of the officers asked some partygoers to move their beer keg inside their RV, Bartlett started yelling at the RV owners not to speak with the police. *Id.* When the officer attempted to speak with Bartlett, Bartlett allegedly yelled at the officer to leave, which the officer did. *Id.*

Several minutes later, Bartlett observed the second officer asking a minor whether he and his underage friends had been consuming alcohol. *Id.* Bartlett approached the second officer and stood between him and the minor, yelling at the second officer not to speak with the minor. *Id.* The second officer then pushed Bartlett back and the first officer arrived to assist. *Id.* at 1720-21. The first officer immediately initiated an arrest. *Id.* at 1721. Bartlett eventually sued both officers, alleging that they arrested him in retaliation for exercising his First Amendment rights. *Id.* The district court granted summary judgment to the officers after finding that the officers had probable cause to arrest Bartlett. *Id.* The Ninth Circuit reversed, holding that a plaintiff can prevail on a First Amendment retaliatory arrest claim even if the arresting officer(s) had probable cause for the arrest. *Id.*

After granting certiorari, the Supreme Court addressed the question that it left unanswered in *Lozman*: whether a retaliatory arrest claim requires a threshold probable cause inquiry. *Id.* The Court agreed with the officers that retaliatory arrest cases present some of the same causal challenges identified in *Hartman*, including: (1) "a tenuous causal connection between the defendant's alleged animus and the plaintiff's injury;" (2) the "wholly legitimate consideration" of speech in making a split-second decision whether to arrest someone; and, (3) the availability of probable cause evidence in "virtually every retaliatory arrest case" and the probative value when such evidence is lacking. *Id.* at 1723-24 (internal quotations and citations omitted). Although the Supreme Court recognized some differences between retaliatory prosecution and retaliatory arrest cases, ultimately, the Court found that the "related causal challenge" in the two types of cases required plaintiffs "pressing a retaliatory arrest claim to plead and prove the absence of probable cause for the arrest." *Id.* at 1724.

Based on the holding in *Nieves*, to the extent that Plaintiff alleges a chilling effect from Deputy Riley's citation, she must show the absence of probable cause for the citation. Although Plaintiff likens this case to *Lozman*, as the Supreme Court recognized in *Nieves*, the Court in *Lozman* "limited [its] holding to arrests that result from official policies of retaliation." 139 S. Ct. at 1722 (citing *Lozman*, 138 S. Ct. at 1953-54). Plaintiff fails to allege — and the undisputed facts fail to support — an official policy of retaliation adopted by Spotsylvania County against Plaintiff. Rather, to the extent that Plaintiff alleges that Deputy Riley's citation had a chilling effect on her speech, she must demonstrate the absence of probable cause for that citation. Otherwise, the Court would permit Plaintiff to circumvent her burden to prove that Defendant's retaliatory animus constituted the but-for cause of the citation.

The question then becomes whether Deputy Riley had probable cause to issue the citation to Plaintiff. Otherwise, qualified immunity shields Defendant from liability under Plaintiff's second theory, because Plaintiff fails to show a violation of her constitutional rights. *Saucier*, 533 U.S. at 201. "Probable cause exist[s] if 'at the moment the arrest was made . . . the facts and circumstances within [the arresting officer's] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing'" that Plaintiff had violated the law. *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).

To that end, in her Response, Plaintiff does not refute Deputy Riley's affirmation that he witnessed three vehicles, one of which was operated by Plaintiff, pass a parked school bus with flashing lights and extended "STOP" signs in the process of loading children. (Riley Aff. ¶¶ 5-9.) Indeed, during the stop of her vehicle, Plaintiff conceded that she had passed the school bus and acknowledged Deputy Riley's justification for the citation. (Video at 00:29-01:04.) Pursuant to Local Civil Rule 56(B), the Court may deem admitted any fact not controverted in the statement of genuine issues filed in opposition to a motion for summary judgment. Thus, the undisputed facts show that Deputy Riley witnessed Plaintiff pass a stopped school bus in the process of loading children in violation of Virginia Code § 46.2-859, which provides that "a person driving a motor vehicle shall stop such vehicle when approaching, from any direction, any school bus which is stopped on a highway . . . for the purpose of taking on or discharging children." Violators of § 46.2-859 are deemed "guilty of reckless driving." The video of Plaintiff's traffic stop shows that she received a citation for reckless driving under § 46.2-859. (Video at 10:01-40.) Based on these facts, the Court finds that Deputy Riley had probable cause to issue the traffic citation to Plaintiff, precluding her second theory of liability.

17

**D.    The Undisputed Facts Support a Retaliatory Inducement Theory of Liability for Which Defendant Does Not Enjoy Qualified Immunity, though a Genuine Dispute of Material Fact Remains as to Plaintiff's Right to Recovery.**

In her third and final theory of liability, Plaintiff argues that Defendant's offer to buy Deputy Riley lunch if he issued the citation itself had a chilling effect on her speech. (Pl.'s Resp. at 24.) Therefore, regardless of Deputy Riley's probable cause to issue the traffic citation, Plaintiff contends that she may maintain a cognizable claim against Defendant for her offer to buy Deputy Riley lunch and the retaliatory animus that undergirded that offer. (Pl.'s Resp. at 24.) In essence, Plaintiff establishes a "retaliatory inducement" theory of First Amendment retaliation, whereby a government official may be held liable for inducing another government official to impose governmental force or sanction on another citizen in retaliation for that citizen's exercise of First Amendment rights, whether or not the other government official has probable cause to impose the force or sanction. Plaintiff likens Defendant's retaliatory inducement to the official municipal policy alleged in *Lozman*, which, as mentioned, did not require Lozman to show an absence of probable cause. (Pl.'s Resp. at 24.) Consistent with Supreme Court precedent, the Court will proceed to consider: (1) "whether the [undisputed] facts . . . make out a violation of a constitutional right [under Plaintiff's retaliatory inducement theory];" and, (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 232 (citing *Saucier*, 533 U.S. at 201).

### *1.    A Triable Issue Remains as to Whether Defendant Violated Plaintiff's Constitutional Rights.*

Plaintiff presents a First Amendment retaliation claim, which requires her to prove that: "(1) she engaged in protected First Amendment activity, (2) the defendant[] took some action that adversely affected her First Amendment rights, and (3) there was a causal relationship between her protected activity and the defendant['s] conduct." *Constantine v. Rectors & Visitors*

18

*of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005). Importantly, "[t]o prevail on such a claim, a plaintiff must establish a 'causal connection' between the government defendant's 'retaliatory animus' and the plaintiff's 'subsequent injury.'" *Nieves*, 139 S. Ct. at 1722 (quoting *Hartman*, 547 U.S. at 259). Defendant does not dispute that Plaintiff engaged in protected First Amendment activity when she complained to the Spotsylvania County Sheriff about Defendant, testified in defense of the parking ticket issued to her by Defendant, posted about Defendant on social media and gave "dirty looks" to Defendant. Accordingly, the Court will cabin its analysis to the remaining two elements.

As to the second element, the adverse-effect inquiry is "fact intensive." *Suarez Corp.*, 202 F.3d at 686. A plaintiff alleging retaliatory conduct "must show that the defendant's conduct resulted in something more than a '*de minimis* inconvenience' to her exercise of First Amendment rights," though "a plaintiff need not actually be deprived of her First Amendment rights in order to establish First Amendment retaliation." *Constantine*, 411 F.3d at 500. The adverse-effect standard is objective, and a plaintiff need only show that the government official's conduct "would tend to chill a reasonable person's exercise of First Amendment rights." *Id.* (emphasis removed).

Here, under her retaliatory inducement theory of liability, Plaintiff argues that Defendant's alleged inducement — the offer to buy Deputy Riley lunch — constituted the retaliatory conduct that adversely affected her First Amendment rights. Although Defendant's offer to buy Deputy Riley lunch "is in the nature of speech," and thus seemingly falls under the Fourth Circuit's holding in *Suarez Corporation* that "in the absence of a threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action will imminently follow, such speech does not adversely affect [Plaintiff's] First Amendment rights, even if

defamatory," 202 F.3d at 687, the Court finds Plaintiff's retaliatory inducement theory
cognizable, for in reality the offer to buy Deputy Riley lunch constituted an action, *i.e.*, the
inducement of another government official to impose a governmental sanction on a citizen.

That said, a genuine dispute of material facts remains as to whether Defendant's offer to
buy Deputy Riley lunch "resulted in something more than a '*de minimis* inconvenience' to her
exercise of First Amendment rights." *Constantine*, 411 F.3d at 500. To be sure, Plaintiff need
not prove that Defendant's conduct "independently deprive[d] her of a constitutional right,"
*ACLU v. Wicomico County*, 999 F.2d 780, 786 n.6 (4th Cir. 1993); however, Plaintiff will need
to prove some specified harm that "would likely deter 'a person of ordinary firmness' from the
exercise of First Amendment rights," *Constantine*, 411 F.3d at 500 (quoting *Washington v.
County of Rockland*, 373 F.3d 310, 320 (2d Cir. 2004)). Importantly, "[h]urt feelings or a
bruised ego are not by themselves the stuff of a constitutional tort." *Zherka v. Amicone*, 634
F.3d 642, 645-46 (2d Cir. 2011). Therefore, although Plaintiff's retaliatory inducement claim
proves cognizable as a general matter, whether Plaintiff may recover in this instance requires a
more complete presentation of the evidence. After a full presentation of Plaintiff's evidence, the
Court will revisit whether Plaintiff has proven more than a *de minimis* inconvenience to her
exercise of First Amendment rights and decide whether, as a matter of law, a question remains
for the jury.

As to the third factor of Plaintiff's First Amendment retaliation claim, the undisputed
facts show that Defendant's retaliatory motive was a but-for cause of her allegedly injurious
conduct. The recording of Defendant's call to Deputy Riley clearly shows that Defendant's offer
to buy Deputy Riley lunch stemmed from Plaintiff's protected First Amendment activity.
Indeed, Defendant herself identifies Plaintiff's protected First Amendment activity as the

impetus behind her desire that Plaintiff receive a traffic citation. (*See* Video at 02:12-35 (explaining that after issuing a parking ticket to Plaintiff in 2013, Plaintiff "raised holy hell" by complaining to the Sheriff about Defendant, posting on Facebook and giving "dirty looks" to Defendant).) Considering that, on the facts presented, Defendant had no other relationship with Plaintiff that would establish a constitutionally permissible motive for Defendant's offer to buy Deputy Riley lunch, the Court finds no genuine dispute as to whether Plaintiff's protected First Amendment activity caused Defendant to induce the traffic citation.

Based on the foregoing analysis, assuming that Plaintiff's right to be free from retaliatory inducement was a clearly established right at the time of Defendant's alleged conduct, Plaintiff may proceed on her retaliatory inducement theory at trial, with the only triable issues being: (1) whether Defendant's offer to buy Deputy Riley lunch resulted in more than a *de minimis* inconvenience to Plaintiff's exercise of First Amendment rights; and, (2) if so, the amount of damages owed to Plaintiff.

## 2. *Plaintiff's Right to be Free from Retaliatory Inducement Constituted a Clearly Established Right at the Time of Defendant's Conduct.*

"To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotations, alterations and citations omitted). "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). The "clearly established" standard balances a plaintiff's interest in vindicating her constitutional rights with the interest of government officials in "reasonably . . . anticipat[ing] when their conduct may give rise to liability for damages." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). Accordingly, "the right allegedly violated must be established not as a broad general proposition, but in a

21

particularized sense so that the contours of the right are clear to a reasonable official." *Reichle*, 566 U.S. at 665 (internal quotations and citations omitted).

To be sure, qualified immunity does not require that "the very action in question has previously been held unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). Indeed, the Supreme Court has held that "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." *Anderson*, 483 U.S. at 640 (internal quotations and citations omitted). Thus, "the salient question" becomes whether the state of the law at the time of the alleged conduct "gave [the government official defendant(s)] fair warning that their alleged [conduct] was unconstitutional." *Hope*, 536 U.S. at 741.

After reviewing the state of the law in this Circuit in January 2019, the Court finds that a reasonable law enforcement officer would have known that inducing another officer to issue a citation to a citizen in retaliation for the citizen's protected First Amendment activity violated the citizen's constitutional rights.[1] For one, the Fourth Circuit's 2013 decision in *Tobey* recognized that "effect[ing]" someone's arrest in retaliation for their exercise of First Amendment rights without probable cause to effect that arrest established a viable First Amendment retaliation claim. 706 F.3d at 387-92. Likewise, the Supreme Court in *Lozman* found that directing the

---

[1]    Although Defendant's inducement had no apparent impact on Deputy Riley's decision-making, the offer to buy Deputy Riley lunch itself carried a potential chilling effect, which Defendant should have known. In other words, the retaliatory inducement of official government sanction against a citizen proves cognizable regardless of its effectiveness, though effectiveness may demonstrate the more-than-*de-minimis* effect of the government official's conduct. Neither is the Court persuaded by Defendant's suggestion that she cannot be held liable, because she did not know that Plaintiff would discover the contents of her private call. (Def.'s Mem. at 9.) To absolve government officials of liability merely because they did not expect their conduct to be discovered defies common sense and the rule of law. And, in any case, during her phone call, Defendant insisted that Deputy Riley record the traffic stop and Deputy Riley confirmed that his body camera was on. (Video at 02:05-12, 02:47-57.)

arrest of a citizen pursuant to an official retaliatory policy presented a cognizable First

Amendment retaliation claim regardless of the existence of probable cause for the arrest. 138 S.

Ct. at 1954-55. These precedents provided fair notice to government officials in this Circuit that

they could not direct or effect the arrest of a citizen in retaliation for the citizen's protected First

Amendment activity. Logic dictates that if government officials cannot direct or effect the arrest

of a citizen for retaliatory reasons, government officials cannot induce the arrest — or, in this

case, citation — of a citizen for those same reasons, even if the official so induced otherwise has

probable cause for the arrest or citation. *See Williams v. Strickland*, 917 F.3d 763, 770 (4th Cir.

2019) ("[W]e need not—and should not—assume that government officials are incapable of

drawing logical inferences, reasoning by analogy, or exercising common sense."). The

difference between directing or effecting an arrest and inducing it is one of degree, not kind.

    Neither do the policy reasons underlying the qualified immunity doctrine militate in

Defendant's favor. "'Qualified immunity gives government officials breathing room to make

reasonable but mistaken judgments,' and 'protects all but the plainly incompetent or those who

knowingly violate the law.'" *Stanton v. Sims*, 571 U.S. 3, 5 (2013) (quoting *al-Kidd*, 563 U.S. at

743 (internal quotations and citations omitted)). "It does so by helping to avoid 'unwanted

timidity' in performance of public duties, ensuring that talented candidates are not deterred from

public service, and preventing the harmful distractions from carrying out the work of government

that can often accompany damages suits." *Filarsky v. Delia*, 566 U.S. 377, 389-90 (2012)

(quoting and citing *Richardson v. McKnight*, 521 U.S. 399, 409-11 (1997)). Of these policies,

avoiding unwanted timidity constitutes "the most important special government immunity-

producing concern . . . ensuring that those who serve the government do so with the decisiveness

and the judgment required by the public good." *Id.* at 390 (internal quotations and citations

omitted). These considerations do not justify shielding Defendant from liability if Plaintiff proves that Defendant's retaliatory inducement violated her rights.

For one, the undisputed facts show that Defendant did not act in the performance of her public duties when she called Deputy Riley to offer to buy him lunch. Rather, Defendant called Deputy Riley privately without knowing the reasons justifying the stop of Plaintiff's vehicle and attempted to cause the issuance of a citation to Plaintiff by inducing Deputy Riley. Although the Court does not question the dutifulness of Deputy Riley and his decisions during the stop of Plaintiff's vehicle, the same cannot be said of Defendant's conduct. Such conduct cannot possibly be considered a discretionary decision in furtherance of Defendant's duties as a law enforcement officer. Nor does Defendant's decision to call Deputy Riley to induce the issuance of a citation "ensur[e] that those who serve the government do so with the decisiveness and the judgment required by the public good." *Filarsky*, 566 U.S. at 390. Indeed, Plaintiff's protected speech from six years prior had no apparent relevance to whether to issue the citation. *See Lozman*, 138 S. Ct. at 1954 (noting that the causation problem presented in *Hartman* does not present itself "where . . . the [alleged] retaliation [is] for prior, protected speech bearing little relation to the criminal offense for which the arrest is made").

Ultimately, because the state of the law in January 2019 put Defendant on fair notice that her conduct violated Plaintiff's constitutional rights, and after considering the policy reasons underlying the qualified immunity doctrine, the Court finds that qualified immunity does not shield Defendant from liability under Plaintiff's retaliatory inducement theory. However, a triable issue remains as to whether Defendant's conduct violated Plaintiff's rights in this instance, and the Court will revisit whether, as a matter of law, Plaintiff has proven a violation of her rights after the presentation of Plaintiff's evidence during trial.

24

## IV.   CONCLUSION

For the reasons set forth above, the Court GRANTS Defendant's Motion for Summary Judgment (ECF No. 43) to the extent that Plaintiff alleges Defendant's liability on a theory that Defendant threatened, coerced or intimidated her in retaliation for her First Amendment activity or on a theory that the traffic citation issued to her had a chilling effect on her speech, and the Court DENIES Defendant's Motion (ECF No. 43) to the extent that Plaintiff alleges Defendant's liability on a theory that Defendant's inducement of another officer to issue the traffic citation violated her rights.  An appropriate Order shall issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

_____/s/_____
David J. Novak
United States District Judge


Richmond, Virginia
Date:  February 5, 2020